# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-00030-SCT

*IN THE MATTER OF THE ESTATE OF DANE RICHARD EUBANKS, DECEASED: KATHY MAY HUBER, AS PARENT AND LEGAL GUARDIAN FOR AND ON BEHALF OF DAVID RANDALL EUBANKS, JR.*

*v.*

*CECILIA EUBANKS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF DANE RICHARD EUBANKS, DECEASED*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/22/2011 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| TRIAL COURT ATTORNEYS: | VINICENT J. CATIGLIOLA, JR |
| | DAVID E. KIHYET |
| | WILLIAM C. GRIFFIN |
| | AMANDA QUAVE |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | TREVOR BRUCE ROCKSTAD |
| | MATTHEW STEPHEN LOTT |
| ATTORNEYS FOR APPELLEE: | VINCENT J. CASTIGLIOLA, JR. |
| | BETTY CAROLINE CASTIGLIOLA |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 02/12/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Attorneys representing the administratrix of an estate settled wrongful-death claims

under two insurance policies without filing a wrongful-death lawsuit.  The proceeds of the

settlement of the first policy were distributed equally to the wrongful-death beneficiaries. The attorneys submitted the proceeds of the second policy to the chancery court and moved for an unequal distribution, arguing that two half-siblings should recover nothing or, if allowed to recover, less than the three other claimants.

¶2. The chancellor determined that the half-siblings were entitled to recover, and that she had no authority to apportion the wrongful-death settlement proceeds unequally. She divided the proceeds equally among the wrongful-death beneficiaries after awarding attorneys' fees of forty percent of the amount of recovery. Two of the beneficiaries argued that they should not be required to pay attorneys' fees because the attorneys had made numerous attempts, first to exclude them from any recovery, and then to reduce their share.

¶3. The Court of Appeals affirmed the chancellor's determination that the half-siblings were entitled to an equal distribution but remanded for factual findings on the amount of attorneys' fees they should be required to pay.[1] We agree with the Court of Appeals and the trial court that the proceeds must be equally divided. On the issue of attorney fees, four justices on this Court would hold that, because the attorneys had an actual conflict of interest with the half-siblings and acted adverse to their interests; and because they could not satisfy the requirements for *quantum meruit*, they were not entitled to recover any attorneys' fees from the half-siblings shares. Four justices would affirm the Court of Appeals.

**FACTS AND PROCEDURAL BACKGROUND**

---

[1] *Estate of Eubanks v. Eubanks*, No. 2012-CA-00030-COA, 2014 WL 211730, at *2 (Miss. Ct. App. Jan. 21, 2014).

2

¶4.     The facts necessary to adjudicate the issues presented are not in material dispute. In 2006, sixteen-year-old Dane Eubanks was killed in an automobile accident. His mother, Cecilia Borries, contracted with David E. Kihyet Sr. to:

> provide legal services in connection with a Wrongful Death occurring on February 28, 2006 in Jackson County Mississippi, Law Firm shall provide those legal services reasonably required to represent Client . . . .

Cecilia agreed to pay Kihyet a $5,000 retainer and $150 per hour and, should additional insurance be found, "forty-percent (40%) of all monies or equivalent collected in the event of settlement or trial" in lieu of the hourly rate. The contract between Cecilia and Kihyet did not purport to grant Kihyet the authority to represent anyone other than "Client"—defined in the contract as Cecilia Borries.

¶5.     After she was appointed administratrix of Dane's estate, Cecilia petitioned the chancery court to approve "the Legal Contract between the Petitioner [Cecilia, as "Administratrix of the Estate of DANE RICHARD EUBANKS"] and the Honorable DAVID E. KIHYET, SR." No mention was made of the wrongful-death beneficiaries.

¶6.     At the time of his death, Dane was unmarried and had no children, so any distribution of the statutory wrongful-death damages must be distributed in equal shares to the second tier of statutory wrongful-death beneficiaries, which includes his mother, father, sisters and brothers, including half-blood siblings.[2] Because Dane's father had played no role in Dane's life, Kihyet filed a motion seeking to terminate his parental rights and to preclude him from sharing in the wrongful-death benefits.

---

[2] Miss. Code Ann. § 11-7-13 (Rev. 2004).

¶7.	On August 7, 2008, the chancellor granted the motion, declaring that David's parental rights were terminated, and that he was "precluded, enjoined[,] and restrained from being a beneficiary of any Wrongful Death proceeds that may be recovered due to the wrongful death of DANE RICHARD EUBANKS." Because no appeal was taken from this ruling, we shall not address it.

¶8.	At this point, Cecilia and Kihyet learned of the possibility that Dane's father had fathered two children—David Eubanks Jr. and Allison Eubanks—with Kathy May Huber. On December 12, 2008, Huber made an appearance in the chancery court proceedings through counsel, Jane Perry, on behalf of David Jr. and Allison. A DNA test confirmed that David Jr. and Allison were David Sr.'s children and Dane's half-siblings.

¶9.	So Dane's statutory wrongful-death beneficiaries at the time of his death were his mother, Cecilia, his father, David Eubanks (whom the chancellor had precluded from recovery), a brother, Seth, a maternal half-brother, Aiden Borries, and a paternal half-brother, David Eubanks Jr. and half-sister, Allison Eubanks.

¶10.	On March 11, 2009—after obtaining a chancery-court determination of Dane's wrongful-death beneficiaries (Cecilia, Seth, Aiden, David Jr., and Allison), but before filing a wrongful-death lawsuit—Kihyet reached a settlement in the amount of $100,000 with Allstate Insurance Company, the tortfeasor's liability insurance carrier. This settlement was approved by the chancellor on September 29, 2009. From the $100,000 proceeds, Kihyet received $40,000 in attorney fees, and the remaining funds, after payment of expenses, were equally distributed to Dane's wrongful-death beneficiaries, as determined in the chancellor's

4

March 11, 2009 order. The distribution of these settlement proceeds is not at issue in the case before us.

¶11.   Meanwhile, Cecilia—who was married to Dane's stepfather, Kenneth Borries—filed an uninsured-motorist claim against her husband's commercial-vehicle insurance carrier, Allstate, claiming that Dane was covered as a "foster child" under that policy. Allstate disagreed and filed a declaratory-judgment action in the United States District Court for the Southern District of Mississippi, asking the court to declare that no uninsured-motorist coverage existed for Dane under Borries's Allstate policy. The Estate and Cecilia filed a counterclaim arguing that Dane was covered by Borries's policy and that he was entitled to uninsured/underinsured-motorist insurance coverage.

¶12.   Kihyet associated Vincent Castigliola Jr. as cocounsel to assist with the uninsured-motorist litigation against Allstate. Kihyet shared with Castigliola the $40,000 fee already collected under the $100,000 policy and agreed to split future attorneys' fees. The matter proceeded in federal court, with the Allstate attorneys battling Kihyet and Castigliola. We think it important to point out that Cecilia's attorneys never claimed to be representing David Jr.'s or Allison's interests. During a later argument before the chancellor, Castigliola stated:

> I represented as co-counsel with Mr. Kihyet the administratrix of the estate and Cecilia was sued individually and the pleadings are attached more than once as exhibits. My representation dealt with the defense of the declaratory judgment action and the counterclaim directly asserted against Allstate Indemnity Company . . . .

¶13.   Cecilia and Allstate eventually agreed to settle the matter for $250,000. But when the settlement was referred to the chancery court for approval and distribution of proceeds, Cecilia's attorneys strenuously objected to an equal distribution of the proceeds.

5

¶14. First, they argued that the DNA test results had been presented too late to satisfy Section 91-1-15's statute of limitations to establish paternity. The chancellor, later finding the statute was satisfied because David Sr. was listed as the father on David Jr.'s and Allison's birth certificates, rejected this argument.

¶15. Next, they argued that the matter in federal court was not related to a wrongful-death claim, and that the proceeds of the settlement were not for a wrongful-death claim. In representing to the chancellor that he did not recall the settlement being a wrongful-death settlement, Mr. Castigliola stated:

> Nor do I recall any discussion regarding a settlement of any and all claims. What we[were] there to settle was simply what was the relief sought. This was a declaratory judgment action, it named only Cecilia Eubanks, individually and as an administratrix of the estate. It did not refer to her as a wrongful death representative. And it just is what it is.

¶16. Next, realizing the chancery court previously had adjudicated David Jr. and Allison to be wrongful-death heirs in connection with the $100,000 settlement, Castigliola filed a motion to set aside the previous adjudication of wrongful-death heirs and exclude David Jr. and Allison. Castigliola also took the position that, even if David Jr. and Allison were wrongful-death beneficiaries, all of the proceeds should go to the estate, which would exclude David Jr. and Allison, who, even if they were wrongful-death beneficiaries, were not heirs to the estate.

¶17. In advancing these positions, Cecilia and the Estate sought clarification from the federal court as to what claims the federal court case and settlement encompassed. The federal court found that there was a valid meeting of the minds to settle "all of the claims by the Estate which included a later division by the Estate to the five adjudicated heirs and

6

wrongful death beneficiaries." It further found that "how the proceeds are divided within the Estate is left to be determined by the Chancery Court."

¶18. Castigliola then urged the chancery court to recognize and adjudicate claims for Cecilia, Seth, and Aiden for loss of society and companionship. This would result in a larger distribution for them at the expense of David Jr. and Allison.

¶19. The chancellor rejected all of these arguments and divided the settlement proceeds equally among Cecilia, Seth, Aiden, Allison, and David Jr. The chancellor held that any attempt by the chancery court to divide the settlement unequally "would remove this matter from the purview of the Chancery Court as such matters are 'as the jury may determine . . . .'"

¶20. The chancellor also found that, while David Jr. and Allison were not bound by the contingency fee contract, they had benefitted from the attorneys' work on the settlement. She determined the amount of attorneys' fees that David Jr. and Allison would owe Kihyet and Castigliola based upon quantum meruit would greatly exceed the forty-percent contingency fee, so she held that a forty-percent fee was "reasonable and more beneficial to the children than a *quantum meruit* based calculation."

¶21. Huber appealed the award of attorneys' fees against David Jr. and Allison, and Cecilia and the Estate cross-appealed, arguing that the chancellor erred by dividing the settlement equally between the wrongful-death beneficiaries. The Court of Appeals affirmed the chancery court's decision to divide the settlement equally between the wrongful-death beneficiaries, but reversed the chancellor on the issue of attorneys' fees, and remanded for further proceedings for the chancellor to determine entitlement to the claimed fee and to

7

provide express findings in support thereof.[3]  The Court of Appeals further held that any award should also be supported by findings sufficiently distinguishing the legal costs incurred by Castigliola and Kihyat in pursuing legal matters adverse to David Jr. and Allison in the federal court action relating to the Allstate settlement of the second wrongful-death claim.[4]

¶22.   Judge Roberts, concurring in part and dissenting in part, argued that "the chancellor did have jurisdiction to divide the settlement" and that the chancellor should "hear evidence from the beneficiaries and properly divide the settlement among the wrongful-death beneficiaries."[5]

¶23.   The Estate filed a petition for writ of certiorari with this Court, arguing that Court of Appeals decision was in error.  We granted certiorari to elaborate on our decision in *Long v. McKinney*.[6]

## ANALYSIS

I.  **Whether, after a wrongful-death claim has been decided by a jury, or has been settled, a chancellor has authority to entertain a new claim for loss of society and companionship.**

¶24.   This Court was crystal clear in *Long v. McKinney* that the chancery court's jurisdiction in wrongful-death litigation may be invoked in only three instances: (1) for opening the decedent's estate so that beneficiaries may pursue a wrongful-death claim in the

---

[3] *Estate of Eubanks*, 2014 WL 211730, at *14.

[4] *Id.*

[5] *Id.* at *15 (Roberts, J., concurring in part and dissenting in part).

[6] *Long v. McKinney*, 897 So. 2d 160, 174-176 (Miss. 2004).

8

circuit court; (2) for the approval or rejection of a minor's wrongful-death settlement; and (3) to determine wrongful-death beneficiaries.

¶25.    No authority exists for a party to file a new wrongful-death claim for damages in the chancery court, nor is there authority for a chancellor to apportion individual claims for loss of society and companionship.[7]   For these reasons, we must reject any notion that the chancery court in this case had the power to consider and divide the damages for loss of society and companionship unequally.  As we stated in *Pannell v. Guess*, a case directly on point, "the chancellor had no choice but to distribute the insurance settlement proceeds . . . [to the wrongful-death beneficiaries], equally."[8]

¶26.    When a wrongful-death case has concluded by jury verdict or settlement, the proceeds must be divided according to the jury's verdict or the terms of the settlement agreement.  And where no provision is made for any award for loss of society and companionship, a chancellor who is asked to distribute the proceeds must distribute them according to the terms that were decided by the jury or, as here, by the parties to the settlement.  Parties wishing to pursue a claim for loss of society and companionship must do so before settling the case.

¶27.    A chancellor has no choice but to distribute the funds equally.[9]   Had this case been tried in circuit court, with a jury award to one of the parties for loss of society and

---

[7] *Id.* at 174-176 (Miss. 2004).

[8] *Pannell v. Guess*, 671 So. 2d 1310, 1314 (Miss. 1996).

[9] *Id.*

9

companionship, or had the parties settled with an agreement to such an award, then the chancellor certainly could distribute the proceeds accordingly.[10]

## II. Whether *Long v. McKinney* held unconstitutional or "odious" Section 11-7-13's provisions concerning the division of damages.

¶28. In his dissent, my learned and esteemed colleague, Justice Kitchens, incorrectly reports that, in *Long*, we "[o]stensibly" found "the equal distribution of loss of society and companionship damages to be constitutionally odious." We did not.

¶29. In *Long*, this Court recognized that Section 11-7-13 requires an equal division among the wrongful-death beneficiaries of all damages the decedent could have recovered for negligent acts "as would, if death had not ensued, have entitled the party injured or damaged thereby to maintain an action and recover damages in respect thereof . . . ," such as the net present value of the decedent's life, medical expenses, pain and suffering, and lost wages.[11]

¶30. But we also noted that "all parties interested may join in the suit;" that "there shall be but one (l) suit for the same death which shall ensue for the benefit of all parties concerned;" and "in such action the party or parties suing shall recover such damages allowable by law as the jury may determine to be just, taking into consideration all the damages of every kind *to the decedent* and all damages of every kind *to any and all parties interested* in the suit."[12]

¶31. We did not speak to the constitutionality of these provisions. But we did interpret the statute to mean that the wrongful-death damages must be divided equally among the

---

[10] *See Long*, 897 So. 2d at 169 ("The beneficiaries are entitled to recover for their respective claims of loss of society and companionship.").

[11] *Id*. at 168 (citing Miss. Code Ann. § 11-7-13).

[12] *Long*, 897 So. 2d at 168 (emphasis added).

10

wrongful-death beneficiaries, and that individual damages due to a particular party may be recovered by that party. Our interpretation in *Long* of the statutory provisions concerning the division of damages is best understood by way of an example.

¶32.    Suppose a defendant caused the wrongful death of a man who left behind two wrongful-death beneficiaries—a wife who had lived with him for fifty years and cared for him day and night during his final illness, and a forty-year-old son who hated his father and had not visited, called, or seen him in twenty years. And further suppose a jury returned a verdict of $1 million in wrongful-death damages for the man's pain, suffering, lost wages, and the net-present value of his life, plus an award of $500,000 to his wife for her loss of society, companionship, and consortium. All agree the statute requires that the wife and son must equally share the $1 million in wrongful-death damages. But Justice Kitchens interprets Section 11-7-13 to require that the wayward son, who cared nothing for his father, receive half the money the jury awarded the man's wife for her individual loss of society, companionship, and consortium. *Long* interpreted the statute otherwise.

¶33.    Our discussion of the constitutionality of previous interpretations of Section 11-7-13's procedural requirements—which had nothing to do with the division of damages—began with the following:

> The case before us should be, *procedurally* at least, an uncomplicated case. However, previous attempts to *interpret the procedural provisions* of our Statute have complicated wrongful death litigation, and have provided our trial judges and trial bar with unnecessary difficulty. Accordingly, we must now meet our constitutional responsibility by scrutinizing the Statute for those matters which are judicial (including procedural provisions), and by

11

*establishing the procedure to be followed* in wrongful death litigation, those provisions notwithstanding.[13]

¶34. Our first procedural concern was that the provisions of Section 11-7-13 had been interpreted "to allow a suit by the personal representative, or by the wrongful death heirs, but not by both," meaning courts had interpreted the statute "to provide exclusive authority to a wrongful death beneficiary who files suit to pursue the claims of the estate."[14]

> We elaborated by pointing out that, according to the record in the ***Long*** case, we had an excellent trial judge with many years experience on the trial bench, and excellent lawyers with many years of litigation experience, who believe[d] that, under the Statute, [one of the wrongful-death beneficiaries who also was the sole beneficiary under the decedent's will was allowed to] prosecute the case on behalf of all persons entitled to recover, with or without their consent; and that, absent her agreement, other claimants [were] prohibited from joining in to participate in the litigation with counsel of their choice.[15]

¶35. We then pointed out the numerous conflicts of interest this previous procedural interpretation produced, including that:

> the attorney who represents the first heir to file "controls" the litigation, and represents all heirs (whether they agree to such representation or not), and that the attorney is not only justified, but indeed compelled, by [these interpretations of] the Statute to oppose his "clients," should they attempt to join the litigation with counsel of their choice.[16]

¶36. And, in summing up the point, we stated:

> By our decision today and the *procedure announced below*, we intend to eliminate the inherent conflict of interest and simplify the decisions to be made by trial courts where more than one heir wishes to participate in the litigation

---

[13] ***Id***. at 163 (emphasis added).

[14] ***Id***. at 168 (internal citations omitted).

[15] ***Id***. at 168-69.

[16] ***Id***. at 170-71.

12

to protect their individual interests. We also address the dilemma faced by counsel who have seemingly been forced into the uncomfortable position of representing a client with conflicts of interest.

The resolution of this case requires only that we address *appropriate practice and procedure* in wrongful death litigation. *No substantive law is involved.*[17]

¶37. We then discussed joinder of parties, as controlled by Mississippi Rule of Civil Procedure 19, and the role of the chancery court under current statutes and procedural rules; and we then set down the procedural rules to be followed, including the absence of authority to consolidate separate suits, the joinder of parties, control of the litigation, and the duties and obligations of counsel.

¶38. Our discussion of individual claims for damages under Section 11-7-13 did not find the statute "constitutionally odious." We did no more than interpret the statute as allowing individuals with claims for loss of society and companionship to recover those damages individually. Specifically, in our discussion of potential conflicts of interest, we stated:

> For instance, the estate is entitled to recover funeral costs and final medical expenses. The beneficiaries are entitled to recover for their respective claims of loss of society and companionship. The wrongful death beneficiaries are entitled to recover the present net cash value of the decedent's continued existence. . . . A disinherited heir who is also a wrongful death beneficiary will have no interest in pursuing claims for the estate. The representative of the estate will have no interest in pursuing recovery for the disinherited heir. Each beneficiary must consider whether to bring their own individual claim for loss of society and companionship. A spouse may have a claim for loss of consortium. Where there is a limited fund for recovery, the potential for conflicts of interest, real and apparent, are enormous.[18]

---

[17] *Id.* at 171 (emphasis added).

[18] *Id.* at 169.

¶39. This language by no means was a determination that Section 11-7-13, or any part of it, was unconstitutional. Instead, we provided a reasonable interpretation of the statutory provisions that address the division of the various kinds of damages, and we found that the statute allows individual claims for loss of society, companionship, and consortium.[19]

¶40. Likewise, in *Caves v. Yarbrough*,[20] we recognized—without disagreement from any justice—that:

> cases filed pursuant to our wrongful-death statute may involve more than one kind of claim. For instance, in addition to claims the decedent could have brought 'if death had not ensued,' *there may be individual claims of loss of consortium, society and companionship*, . . . .[21]

¶41. Justice Kitchens cites several cases, none of which hold that loss of society, companionship, and consortium damages suffered by one person must be divided equally among all wrongful-death beneficiaries, and all of which are easily distinguished from our holding in *Long*. The most glaring example is his citation of *Pannell v. Guess*,[22] from which he provides the following quote: "the wrongful death statute does not provide that the lower court may conduct a hearing to determine how to divide the proceeds. In fact, the statute provides that the funds 'shall be equally distributed.'"[23]

---

[19] *Id*.

[20] *Caves v. Yarbrough*, 991 So. 2d 142 (Miss. 2008).

[21] *Id*. at 148-49 (emphasis added).

[22] *Pannell v. Guess*, 671 So. 2d 1310 (Miss. 1996).

[23] *Id*. at 1314.

¶42. Justice Kitchens's quote is accurate, but he fails to point out that, in *Pannell*, no one had filed suit for individual damages, nor had anyone sought them or negotiated for them prior to the settlement. Prior to any suit being filed, the unmarried minor decedent's father, David Pannell—who had been appointed administrator of her estate—settled the wrongful-death claim with the tortfeasor's insurance company and deposited the proceeds in the registry of the chancery court.

¶43. When a dispute later arose about distribution of the proceeds, the *Pannell* Court correctly held that the *chancery court* (the lower court referred to in *Pannell*) had no authority to "conduct a hearing to determine how to divide the [settlement] proceeds."[24] At that stage of the proceedings, any division by the chancery court other than an equal division among the wrongful-death beneficiaries would have been error. Damage claims for an individual's loss of society and companionship and loss of consortium would have to have been made in a properly filed lawsuit in the circuit court, or negotiated for in settlement. In *Pannell*, as in the case before us today, by the time the settlement agreement reached the chancery court, it was too late for someone to make a new claim for recovery. And because *Pannell* said nothing different from our holding in *Long*, we had no reason to overrule it.

¶44. The question of whether a family member may join an individual claim for loss of society, companionship, and consortium in a properly-filed wrongful-death lawsuit is not before us. In this case, as in *Pannell*, no wrongful-death lawsuit was ever filed. The

---

[24] *Id.*

chancellor correctly held that she did not have the power or authority to divide the proceeds of the settlement unequally.

¶45. As an afterthought, and as another reason for our disagreement with Justice Kitchens's views, we point out that, a decade ago in *Long*, we interpreted Section 11-7-13 as allowing an individual claim and recovery for loss of society, companionship, and consortium. We have continued to apply that interpretation in cases such as *Caves*, discussed above. That interpretation was left intact in 2013 when the Legislature reenacted Section 11-7-13. This presents the question of whether—even if Justice Kitchens's interpretation of the statute were correct—it is precluded by *stare decisis*.

¶46. In *Caves*, we were called upon to decide whether the statute of limitations for the Mississippi Tort Claims Act was subject to a discovery provision.[25] Although no discovery provision can be found within the statutory language, prior decisions by this Court had held that a discovery provision applied.[26] And, after those decisions recognizing a discovery provision, the Legislature had reenacted the statutes without correcting our interpretation.[27] This caused us to consider whether the Legislature's failure to act was an endorsement of our previous interpretations of its statutes, and whether those previous decisions should be followed pursuant to the doctrine of *stare decisis*.[28] We concluded and held as follows:

---

[25] *Caves*, 991 So. 2d at 146.

[26] *Id.* at 150.

[27] *Id.* at 153.

[28] *Id.* at 150.

16

While we do not agree that the Legislature's mere silence is enough, we do agree with the view offered by Justice Roberts in ***Helvering v. Hallock***, 309 U.S. 106, 130-32, 60 S. Ct. 444, 84 L. Ed. 604 (1940), that congressional re-enactment of a statute creates a presumption of legislative approval of the Court's prior interpretations of that statute. This threshold test for application of stare decisis has been followed in numerous cases. For instance, in ***Lorillard, Div. of Loew's Theatres, Inc. v. Pons***, 434 U.S. 575, 580-81, 98 S. Ct. 866, 55 L. Ed. 2d 40 (1978), Justice Marshall noted, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."[29]

¶47. We agree with this reasoning and hold that—in cases where this Court concludes a statute was incorrectly interpreted in a previous case—we will nevertheless continue to apply the previous interpretation, pursuant to the doctrine of *stare decisis*, upon finding the Legislature amended or reenacted the statute without correcting the prior interpretation.[30] In our view, such action on the part of the Legislature amounts to incorporation of our previous interpretation into the reenacted or amended statute.[31]

¶48. We find the chancellor in this case correctly concluded that she was without authority to entertain claims of loss of society and companionship, or to unequally divide the wrongful-death settlement proceeds.

### III. Whether the chancellor erred by granting Castigliola and Kihyet any award of attorneys' fees from the portion of the settlement due to David Jr. and Allison.

¶49. The chancellor recognized that David Jr. and Allison had no contract or agreement with Kihyet or Castigliola, and that they were not bound by the forty-percent provision

---

[29] ***Id.*** at 153.

[30] ***Id.*** at 153-154.

[31] ***Id.***

17

concerning attorney's fees. Then, based on the attorneys' estimates of hours spent working on the case, she calculated what would be the attorneys' fees on an hourly rate basis under the doctrine of *quantum meruit*. And because that amount exceeded forty percent, she granted the lawyers a fee of forty percent.

¶50.    As the chancellor noted, David Jr. and Allison were not contractually obligated to pay Castigliola and Kihyet anything. It is true that the absence of a contract does not preclude a recovery of attorneys' fees on a *quantum meriut* basis. But four justices would find that, under the facts of this case, the chancellor erred by finding the elements necessary for *quantum meruit* were met. For *quantum meruit* to apply, the chancellor must find that "(1) valuable services were rendered or materials furnished," and (2) that they were furnished "*for the person sought to be charged*."[32] The chancellor also must find (3) that the "services and materials were accepted by the person sought to be charged, used and enjoyed by him," and (4) under the circumstances, it was understood that the person performing such services expected to be paid by the person sought to be charged.[33]

¶51.    Here, the second element clearly was not satisfied. Castigliola and Kihyet were retained to represent the estate and engaged in settlement negotiations on behalf of the estate. What is more, Castigliola argued that he never represented David Jr. and Allison; he actively sought to preclude their recovery altogether of any portion of the settlements; he attempted

---

[32] ***Tupelo Redevelopment Agency v. Gray Corp., Inc.***, 972 So. 2d 495, 514 (Miss. 2007) (quoting ***In re Estate of Fitzner***, 881 So. 2d 164, 173-74 (Miss. 2003)) (emphasis added).

[33] ***Tupelo Redevelopment Agency***, 972 So. 2d at 514-15 (quoting ***In re Fitzner***, 881 So. 2d at 173-74).

18

to have the chancellor change her prior adjudication of beneficiaries and exclude David Jr. and Allison; and he worked to reduce the portion they finally obtained.

¶52.   Four justices find that these attorneys who were actively litigating against the half-siblings' interests—and with whom they had an actual conflict of interest—cannot be found to have been rendering legal representation "for the person sought to be charged," as required for a *quantum meruit* award.  We would find the attorneys' own arguments and actual conflict of interest are dispositive, and they were not entitled to recover any attorneys' fees from David Jr. and Allison.  But because a majority of justices have not voted to reverse the Court of Appeals, its opinion and holding on this issue for this case must stand.

## CONCLUSION

¶53.   We affirm the chancellor's finding on the cross-appeal that, under the facts of this case, the settlement proceeds must be equally divided and we also affirm the Court of Appeals on this issue.  And because a majority of justices have not voted to reverse the Court of Appeals with respect to the issue of attorney fees, its opinion and holding on this issue, reversing in part and remanding, for this case must stand.

¶54.   **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., LAMAR AND COLEMAN, JJ., CONCUR.  KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.  KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND CHANDLER, J. ; KITCHENS, J., JOINS THIS OPINION IN PART. PIERCE, J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶55. I agree with my colleagues in the plurality that the chancellor correctly concluded that she was without authority to divide the wrongful death settlement proceeds unequally. I write separately to express my disagreement with the line of cases which allows for a proportional division of damages for loss of society and companionship among wrongful death beneficiaries.

¶56. The wrongful death statute, Mississippi Code Section 11-7-13, provides, in pertinent part:

> Damages for the injury and death of a married man shall be *equally distributed* to his wife and children, and if he has no children all shall go to his wife; damages for the injury and death of a married woman shall be *equally distributed* to the husband and children, and if she has no children all shall go to the husband; and if the deceased has no husband or wife, the damages shall be *equally distributed* to the children; *if the deceased has no husband, nor wife, nor children, the damages shall be distributed equally to the father, mother, brothers and sisters, or such of them as the deceased may have living at his or her death*.

Miss. Code Ann. § 11-7-13 (Rev. 2004) (emphasis added). "There shall not be, in any case, a distinction between the kindred of the whole and half blood of equal degree." Miss. Code Ann. § 11-7-13. The language mandating equal distribution of wrongful death damages first appeared in Section 721 of the Mississippi Code of 1906, having been approved to amend chapter 663 of the Mississippi Code of 1892 on March 23, 1896. Act of Mar. 23, 1896, ch. 86 § 3, 1896 Miss. Laws. *See* Act of Jan. 27, 1898, ch. 65 § 3, 1898 Miss. Laws. Now Mississippi Code Section 11-7-13, this provision consistently has been reaffirmed by the legislature, most recently during the 2014 legislative session. *See* Miss. Code Ann. § 11-7-13 (Supp. 2014).

¶57.   This Court long has held that, "[o]n appellate review, we strictly construe Mississippi's wrongful death statute." ***Pannell v. Guess***, 671 So. 2d 1310, 1313 (Miss. 1996) (citing ***Smith v. Garrett***, 287 So. 2d 258, 260 (Miss. 1973) (" . . . the wrongful death statute created a cause of action unknown to the common law, and must be strictly construed.") (citing ***Logan v. Durham***, 231 Miss. 232, 95 So. 2d 227 (1957))). The statute allows for the consideration of "all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit." Miss. Code Ann. § 11-7-13 (Rev. 2004). This Court has interpreted the language of Section 11-7-13 to include "(1) the present net cash value of the life expectancy of the deceased, (2) *the loss of the companionship and society of the decedent*, (3) the pain and suffering of the decedent between the time of injury and death, and (4) punitive damages." ***McGowan v. Wright***, 524 So. 2d 308, 311 (Miss. 1988) (emphasis added) (citing ***Jesco, Inc. v. Whitehead***, 451 So. 2d 706, 710 (Miss. 1984); ***Sheffield v. Sheffield***, 405 So. 2d 1314, 1318 (Miss. 1981); ***Dickey v. Parham***, 331 So. 2d 917, 918-19 (Miss. 1976); ***Thornton v. Ins. Co. of North Am.***, 287 So. 2d 262, 265 (Miss. 1973); ***Scott v. K-B Photo Service, Inc.***, 260 So. 2d 842, 844 (Miss. 1972); ***Boyd Constr. Co. v. Bilbro***, 210 So. 2d 637, 643 (Miss. 1968)).

¶58.   In ***Pannell***, this Court held that "the wrongful death statute does not provide that the lower court may conduct a hearing to determine how to divide the proceeds. In fact, the statute provides that the funds 'shall be equally distributed.'" ***Pannell***, 671 So. 2d at 1314. The Court continued: "under Miss. Code Ann.§ 11-7-13 (Supp. 1991), the chancellor had no choice but to distribute the insurance settlement proceeds . . . equally." ***Id.*** As such, the Court declined to find erroneous "the chancellor's refusal to hold a separate hearing in which each

21

wrongful death beneficiary could attempt to prove his or her individual damages (and therefore, the right to receive a larger or smaller portion of the insurance proceeds) . . . ." *Id.*[34]

¶59.    Nevertheless, in 2004, this Court departed from its prior interpretation of the wrongful death statute and held that, "because we find provisions of the Statute which are not in accord with this opinion to be 'an impingement upon the constitution,' . . . where provisions of this opinion conflict with the Statute, the provisions herein shall control." *Long v. McKinney*, 897 So. 2d 160, 164 (Miss. 2004). According to the *Long* Court, "in wrongful death litigation, there are several kinds of damages which may be pursued, and these damages are not due to the same claimants." *Id.* at 169. The Court continued: "[t]he beneficiaries are entitled to recover for their *respective* claims of loss of society and companionship" and "[t]he wrongful death beneficiaries are entitled to recover the present net cash value of the decedent's continued existence." *Id.* (emphasis added). Ostensibly, the *Long* Court found the equal distribution of loss of society and companionship damages to be constitutionally odious. However, no analysis of the constitutionality of the division of wrongful death proceeds in this specific context can be found in *Long*.

¶60.    Three years later, this Court considered whether the defendant was entitled to a judgment notwithstanding the verdict in a case in which the plaintiff had failed to prove any damages for loss of society and companionship. *River Region Med. Corp. v. Patterson*, 975

---

[34]It was on the basis of *Pannell* that the Court of Appeals in the present case affirmed "the chancellor's judgment ordering that the settlement proceeds should be divided equally among the wrongful death beneficiaries." *Estate of Eubanks v. Eubanks*, 2013 WL 211730, *14 (citing *Pannell*, 671 So. 2d at 1314).

So. 2d 205 (Miss. 2007). After the decedent had died during childbirth, her husband and two daughters filed a wrongful death action against River Region, where the decedent had been hospitalized. *Id.* at 206. Plaintiffs sought damages only for loss of society and companionship, and the jury awarded them $1,710,000. *Id.* Following the Warren County Circuit Court's denial of defendant's motion for judgment notwithstanding the verdict, defendant appealed. *Id.* The daughters settled their claims with the defendant the next year, leaving only the widower's claims before this Court on appeal. *Id.*

¶61.    This Court cited *Long* for the proposition that "[t]he beneficiaries are entitled to recover for their *respective* claims of loss of society and companionship." *Id.* at 208 (quoting *Long*, 897 So. 2d at 169) (emphasis in *Patterson*). "Assuming Thomas Patterson was a legitimate wrongful-death  beneficiary, as we must do in giving him all reasonable inferences," this Court opined, "he would then be entitled to recover for himself any loss of society and companionship he might prove, and to share equally in the damages which might have been recovered by Ms. Nettles [the decedent], 'had death not ensued.'" *Id.* at 208 (quoting Miss. Code Ann. § 11-7-13 (Rev. 2004)). The Court held that, because "Patterson presented no evidence regarding any damages sustained from loss of society and companionship," the defendant "was entitled to judgment notwithstanding the verdict as to Patterson's claim." *Id.* at 208.

¶62.    Justice Graves dissented, reasoning that "Section 11-7-13 does not contain any language as used by the majority that 'beneficiaries are entitled to recover for their respective claims of loss of society and companionship.'" *Patterson*, 975 So. 2d at 210 (Graves, J., dissenting). He pointed out that, though "[a]n equal distribution of such damages may seem

23

unfair," a "strict construction of the statute would lead one to conclude that there would be no need for Patterson to prove individual damages for loss of society and companionship." *Id.* I agree with Justice Graves's analysis.[35]

¶63.     Permitting unequal distribution of damages for loss of society and companionship "individual to each beneficiary" tends to foster situations reminiscent of a comedy routine often performed by the Smothers Brothers: "Mom always liked you best." Under the ***Long*** and ***Patterson*** cases, wrongful death beneficiaries—siblings and/or half siblings—can be thrown into courtroom competition with each other in petty, rivalrous efforts to prove which survivor most loved and/or was loved by the decedent.

¶64.     It is true, as my learned colleague Justice King  notes, that the Mississippi Constitution vests our chancery courts with jurisdiction of  "[a]ll matters in equity," "[m]atters testamentary and of administration," and "[m]inor's business." Miss. Const. art. 6, § 159. And it is true that "the chancery court clearly had jurisdiction over approving and dividing the settlement at issue." King Op. ¶70. But Justice King concludes that, "in limited circumstances such as the case before us today," the chancery court has "the power to consider and divide the damages for loss of society and companionship unequally." King Op. ¶70. However, none of the cases cited by Justice King stands for this proposition. *See*

_____

[35] Presiding Justice Dickinson presents his interpretation of ***Long*** by way of analogy, stating that "Justice Kitchens interprets Section 11-7-13 to require that the wayward son who cared nothing for his father, receive half the money the jury awarded the man's wife for her individual loss of society, companionship, and consortium." Pl. Op. ¶32. I agree that such a result may seem unfair, but echo Justice Graves's dissent in ***Patterson***: if the statute is strictly construed, the wayward son would not need to prove individual damages for loss of society and companionship. *See Patterson*, 975 So. 2d at 210 (Graves, J., dissenting).

24

*Derr Plantation, Inc. v. Swarek*, 14 So. 3d 711, 716 (Miss. 2009) (chancery court vested with jurisdiction of specific performance of a real estate contract); *McLendon v. Miss. State Highway Comm'n*, 38 So. 2d 325, 327 (Miss. 1949) (where equity jurisdiction attaches by the chancery court's "having taken jurisdiction on any one ground of equity," chancery court "will thereupon proceed in the one suit to a complete adjudication and settlement of every one of all the several disputed questions materially involved in the entire transaction . . . ."); *Ill. Cent. R. Co. v. Nelson*, 245 Miss. 395, 401 (1962) (chancery court exercised jurisdiction of and awarded damages in wrongful death action "because of attachment features of the case.").

¶65.    Mississippi Code Section 11-7-13 mandates the equal distribution of damages relating to loss of society and companionship in a wrongful death action. This has been the law of Mississippi for more than a century.  But ten years ago, with the advent of *Long*, this Court implicitly determined that equal distribution in this context is unconstitutional, in the complete absence of any analysis of its perceived constitutional infirmity.

¶66.    The plurality takes the position  that the *Long* Court "did no more than interpret the statute as allowing individuals with claims for loss of society and companionship to recover those damages individually." Pl. Op. ¶38. With respect, that is much more than a mere interpretation of Section 11-7-13, which mandates that "the damages shall be distributed equally . . . ." Miss. Code Ann. § 11-7-13. And, more importantly, the interpretation differed from *Pannell*, which had held that because the decedent "was not survived by a husband or children," under Mississippi Code Section 11-7-13, "the chancellor had no choice but to distribute the insurance settlement proceeds to [the decedent's] father, mother, half-sisters

and half-brother, equally." ***Pannell***, 671 So. 2d at 1314. The Court rejected the argument that the wrongful death statute permits the lower court to "conduct a hearing to determine how to divide the proceeds." ***Id.***

¶67.     With regard to the issue of the award of attorney fees, while Presiding Justice Dickinson articulates some valid points with regard to Attorneys Kihyet's and Castigliola's having actively litigated against Dane Eubanks's half-siblings, David Eubanks, Jr., and Allison Eubanks, I agree with Justice King that these two lawyers did, in fact, work to maximize the monetary amount of the settlement for its ultimate beneficiaries, which included David Eubanks, Jr., and Allison Eubanks. I agree with Justice King that this case ought to be reversed and remanded for a deduction only of the legal costs incurred post-settlement, during which time Attorneys Kihyet and Castigliola acted adversely to Dane's half siblings by seeking exclusion of them from the settlement award.

¶68.     The legal landscape of ***Long*** and its progeny entitles wrongful death beneficiaries to recover damages for loss of society and companionship which they may prove. *See* ***Patterson***, 975 So. 2d at 208. I would not have departed from the sensible and well-settled law and practice as articulated by this Court in ***Pannell***, that wrongful death proceeds, whatever the nature of such damages, must be divided equally among all wrongful death beneficiaries.

### KING, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶69.     I disagree with the contention that the chancellor had no jurisdiction to divide the damages for loss of society and companionship unequally. I also disagree with the plurality's analysis on the issue of attorneys' fees. However, because I agree with the equal division of

26

damages in this particular case, I concur with that portion of the result, as well as with its conclusion that damages for loss of society and companionship may be divided unequally in wrongful death cases.

### 1. Chancery Court Jurisdiction

¶70.    I believe that a chancery court, under certain limited circumstances such as the case before us today, has the jurisdiction to apportion damages amongst the beneficiaries. Chancery courts have full jurisdiction in "[a]ll matters in equity," "[m]atters testamentary and of administration," and "[m]inor's business." Miss. Const. art. 6, § 159. Thus, the chancery court clearly had jurisdiction over approving and dividing the settlement at issue.[36] This Court has held that once a chancery court's equity jurisdiction has attached, it has the discretion to award legal and punitive damages. *Derr Plantation, Inc. v. Swarek*, 14 So. 3d 711, 716 (2009). Certain legal claims may lie within the pendent jurisdiction of the chancery court, once its original jurisdiction has attached.[37] *Id.*

---

[36]The opinion of the Court states that the chancellor did not have the power or authority to divide the proceeds of the settlement unequally. Taken to its logical conclusion, this view leads to the conclusion that the chancellor did not have the authority to divide the settlement at all, equally or unequally, nor award any of the settlement to the half-siblings, because the settlement was not the result of a jury verdict. Indeed, the chancellor had jurisdiction over the case primarily due to its retention of the matters of the estate. As the estate argued, the half-siblings were not heirs. How then, under such a view, did the chancellor have any authority at all to divide the settlement amongst non-heirs? The plurality also opines that a "chancellor who is asked to distribute the proceeds must distribute them according to the terms that were decided by the jury or, as here, by the parties to the settlement." Op. at ¶ 26. The terms agreed to by the parties to the settlement stated that the chancellor would determine the distribution of damages, *not* that the damages were to be distributed equally.

[37]This concept promotes judicial economy, so that, in the rare cases in which chancery court jurisdiction overlaps circuit court jurisdiction, the parties do not have to try two cases in two different courts. Moreover, in cases such as the one before us today, this concept

27

> "[T]he Chancery Court having taken jurisdiction on any one ground of equity, will thereupon proceed in the one suit to a complete adjudication and settlement of every one of all the several disputed questions materially involved in the entire transaction, awarding by a single comprehensive decree all appropriate remedies, legal as well as equitable, although all the other questions involved would otherwise be purely of legal cognizance . . . . having taken jurisdiction the power of the court to administer full relief is limited by nothing but justice itself."

*Id.* (quoting *McLendon v. Miss. State Highway Comm'n*, 38 So. 2d 325, 327 (Miss. 1949)).

Thus, the chancery court in this case had the power to consider and divide the damages for loss of society and companionship unequally. *See Ill. Cent. R. Co. v. Nelson*, 245 Miss. 395 (1962) (wrongful death action tried in chancery court, which determined damages).

¶71. However, while I believe that loss of society and companionship damages may be divided unequally, and that it was within the jurisdiction of the chancery court in this case to do so, I agree with the chancellor's ultimate decision to divide the damages equally in this case. As noted, damages which would have been recoverable by the decedent had death not ensued are shared equally amongst the wrongful-death beneficiaries, while damages for loss of society and companionship are individual to each wrongful-death beneficiary. The $250,000 settlement in this case was for "all claims" and the counterclaim appears to focus on damages that would have enured to the benefit of the decedent had death not ensued, stating that "[t]he injuries suffered by Dane Eubanks in the collision in issue resulted in compensable damages for pain, suffering, mental anguish, medical expenses, funeral

---

promotes settlement. If parties cannot have a settlement divided unequally in chancery court, but can in circuit court only after filing a lawsuit, they will be more inclined to file a lawsuit than resolve the issue out of court.

expenses, loss of future earnings and other damages."[38]  Nothing in the record before us

indicates which portion of the settlement, if any, was designated as compensation for

damages recoverable by Dane had death not ensued, and which portion of the settlement, if

any, was for the purpose of compensating the beneficiaries for their individual claims of loss

of society and companionship.[39]  Without any indication as to which type of damages the

settlement encompasses, I cannot say that the chancellor abused her discretion or was

manifestly wrong by dividing the entire settlement equally among the beneficiaries,

especially since the record indicates that the damages were more likely of the type that the

decedent would have recovered had death not occurred.  However, I emphasize my belief

that the chancery court in this case did have the jurisdiction to divide the damages unequally,

and should have done so had the record indicated which portion of the settlement was

designated to compensate for loss of society and companionship.

### 2. Attorneys' Fees

¶72.    I disagree with the plurality's analysis regarding attorneys' fees.  The plurality finds

that Kiyhet and Castigliola did not perform services for Allison and David Jr.[40]  The

---

[38]Cecilia also vociferously argued that the settlement was an asset of the Estate, not a wrongful-death settlement, which would indicate that the settlement was for damages Dane would have recovered had death not ensued.

[39]The chancery court even allowed the parties to proffer evidence regarding an unequal distribution of damages.  Cecilia and Seth proffered evidence regarding their loss of society and companionship damages, but no one presented any evidence regarding the amount of other types of damages encompassed by the settlement.

[40]It is undisputed that David Jr. never even met Dane, as he had not yet been born when Dane passed away.  It appears that Allison, who was one year old at the time of Dane's death and who lived with the same father who was found by the chancery court to not have been involved in Dane's life, had little-to-no involvement with Dane.  Yet, these children,

29

attorneys' goal in settling the doubtful claim was to maximize settlement, without regard to how that settlement would ultimately be distributed. As in *Pannell v. Guess*, after the settlement was made with the insurance company, the parents attempted to exclude the half-siblings from sharing in that settlement. *Pannell v. Guess*, 671 So. 2d 1310, 1312 (Miss. 1996). Then, the half-siblings "hired their own attorney to represent them in any *further matters* dealing with the *distribution* of the wrongful death proceeds." *Id.* (emphases added). The Court still remanded for a determination of whether the contingency fee in the contract not signed by the half-siblings was reasonable, since the half-siblings derived a benefit from the attorney's efforts and acquiesced to the settlement amount. *Id.* at 1315. It further found that if the chancellor "should find that the contingency fee was not reasonable under the facts of this case, then he may assess a fee based on *quantum meruit*." *Id.* Certainly, in the case at hand, Kiyhet and Castigliola should not receive any payment from Allison and David Jr. for their work on how to distribute the proceeds of the settlement, as, in this regard, they worked against the interests of Allison and David Jr. However, Kiyhet and Castigliola obtained the settlement for the benefit of all who were to share in it, which ultimately included Allison and David Jr. And Allison and David Jr. derived benefit from the efforts of Kiyhet and Castigliola, and did not object to the settlement amount. Thus, Kiyhet and Castigliola did perform services for Allison and David Jr., as they provided services to maximize the settlement for any and all who were to share in the proceeds. Only *after* the

---

through their mother, seek monetary compensation for Dane's death.

settlement was maximized to the benefit of all sharing in the proceeds[41] did Kiyhet and Castigliola take positions adverse to Allison and David Jr.[42]  The plurality would have Allison and David Jr., one of whom had no relationship to the deceased and the other who had little or no relationship with him, and neither of whom endeavored to spend the money to defend the suit from which this settlement arose, reap the full financial benefit of the settlement without paying the attorneys who achieved that settlement for them.

¶73.    In sum, I generally agree with the Court of Appeals' analysis regarding attorneys' fees chargeable to Allison and David Jr.  However, I do believe that the Court of Appeals may have overstated the amount of attorneys' fees that should be deducted.  It found that "the chancellor deducted no legal costs incurred by the attorneys herein in pursuing claims and positions in federal court during the second wrongful-death claim, related negotiations, and the federal court motion to clarify in an attempt to exclude David Jr. and Allison from sharing in the $250,000 Allstate settlement proceeds." *Eubanks*, 2014 WL 211730, at \*13. To be certain, attorneys' fees associated with the motion to clarify in federal court should be deducted.  However, Allison and David Jr. clearly derived a benefit from the settlement negotiations with Allstate pursuant to the federal court action. *See Franklin v. Franklin ex rel. Phillips*, 858 So. 2d 110, 123 (Miss. 2003).  During the settlement negotiations, the objective of Kiyhet and Castigliola was to maximize the monetary amount of the settlement.

---

[41]Even Huber admits in her original brief that it was "immediately *after*" obtaining the settlement that Kiyhet and Castigliola took positions adverse to Allison and David Jr.

[42]Indeed, the in the federal court case, Allstate filed a suit against the Estate and the Cecilia, and Kiyhet and Castigliola defended the suit and counterclaimed.  Allison and David Jr. did not endeavor to spend the money to help defend the affirmative suit by Allstate against the Estate.

While they did raise concerns about Allison and David Jr. sharing in the settlement, Allstate refused to address those concerns and all parties agreed that the chancery court would decide the issue of the division of the settlement. Thus, unless the evidence on remand indicates otherwise, only attorneys' fees and expenses incurred after the federal court settlement negotiations should be deducted from the calculation of Allison and David Jr.'s portion of those legal costs.

¶74. I believe that the chancery court was correct in determining that Allison and David, Jr. owed attorneys' fees in some amount, and dissent to the part of the plurality's finding that they owe nothing. I would remand the case for further determinations on this issue.

**RANDOLPH, P.J., AND CHANDLER, J., JOIN THIS OPINION. KITCHENS, J., JOINS THIS OPINION IN PART.**